## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KRISTA PURVIS | : | |
| 99 Pike Street | : | |
| Carbondale, PA 18407 | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No.: _____ |
| | : | |
| v. | : | |
| | : | |
| LACKAWANNA COUNTY, | : | |
| LACKAWANNA COUNTY PRISON | : | **JURY TRIAL DEMANDED** |
| 1371 N. Washington Avenue | : | |
| Scranton, PA 18509 | : | |
| | : | |
| Defendant. | : | |
| | : | |

## CIVIL ACTION COMPLAINT

Krista Purvis (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) by and through her undersigned counsel, hereby avers as follows:

## INTRODUCTION

1.      Plaintiff has initiated this action to redress violations by Lackawanna County, Lackawanna County Prison (hereinafter referred to as "Defendant") of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA").[1] Plaintiff asserts that she was unlawfully removed from work, unlawfully placed on administrative leave, and unlawfully terminated from her job. As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

---

[1] Plaintiff's claims under the PHRA are referenced herein for notice purposes.  She is required to wait 1 full year before initiating a lawsuit from date of dual-filing with the EEOC.  Plaintiff must however file his lawsuit in advance of same because of the date of issuance of his federal right-to-sue-letter under Title VII.  Plaintiff's PHRA claims however will mirror identically her federal claims under Title VII.

## JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. This Court has supplemental jurisdiction over Plaintiff's state-law claim(s) because such claim(s) arise out of the same common nucleus of operative facts as her federal claims asserted herein.

3.      This Court may properly assert personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

4.      Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of the Middle District of Pennsylvania.

5.      Plaintiff is proceeding herein (in part) under Title VII after properly exhausting all administrative remedies with respect to such claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety ("90") days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

## PARTIES

6.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.      Plaintiff is an adult individual, with an address as set forth in the above caption.

8.      The County of Lackawanna ("Defendant"), is a sovereign entity of the United States of America, with the enabling power and authority to establish entities and departments which serve to operate and manage local and state-wide governmental concerns. The Lackawanna County Prison is an agency of Defendant and is a minimum-security detention center located at 1371 N Washington Ave, Scranton, PA 18509.   Plaintiff was hired through and worked from this address.

9.      At all times relevant herein, Defendant acted through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

10.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11.     Plaintiff is a gay (homosexual) female.

12.     Plaintiff was employed with Defendant for approximately 5 years in total (being originally hired in May of 2017), but she spent her last approximate 2.5 years of employment working for Defendant within the Lackawanna County Prison ("LCP").

13.     Effective on or about February 10, 2020, Plaintiff was hired within the LCP as a Lieutenant.

14.     Plaintiff performed so well that she was elevated (and promoted) twice within her first year of employment. She was initially elevated to the position of Acting Captain, and then by in or about August of 2020, as Deputy Warden for Treatment.

15.     Plaintiff worked very hard to establish procedures, treatment processes, oversight, counseling, and other programs within Defendant. Plaintiff had many accomplishments – and from a performance standpoint – performed her job and role *in a stellar manner*.

3

16.     At all relevant times underlying the claims in this lawsuit, Plaintiff's primary manager was the Warden – Timothy Betti ("Betti").

17.     Betti had exhibited (and condoned an institutional) gender bias throughout Plaintiff's employment in many ways, but Plaintiff did her level best to look forward (and ignore), perform well, and she had point-blank tolerated discriminatory treatment and commentary.

18.     However, in the December 2021 – January 2022 timeframe, Plaintiff was becomingly increasingly distressed by Betti's discriminatory treatment of her (as to her ongoing hostile work environment). In particular:

   a)  Plaintiff was now being accused of being in a romantic relationship with Theresa Hernandez (a medical employee (and nurse) working for Wellpath, the entity providing medical services within Defendant);

   b)  Accusations of a relationship were premised upon Plaintiff being lesbian and appearing friendly with Hernandez;

   c)  Betti was inquiring about and perpetuating rumors about Plaintiff allegedly being in a lesbian relationship with Hernandez;

   d)  Plaintiff has and remains married, and she was never in a romantic relationship with Hernandez;

   e)  Betti was showing up to check on Plaintiff at times and scrutinizing her to see if she was in any kind of lesbian relationship; and

   f)  When Plaintiff and Hernandez both had been absent from a meeting, Betti drove to a nearby hotel to check if Plaintiff and Hernandez were at a hotel (with no basis or factually rational reason to assume such - - as they were not at any hotel).

19.     Many people had work relationships or were married within Defendant, but Betti elected to scrutinize, target, and question Plaintiff – because she is a lesbian female. He was not tracking or questioning heterosexual relations within the institution. It would later be confirmed after a full investigation by Defendant that there was no evidence to corroborate Betti's attempts to establish Plaintiff was engaging in lesbian relationship in the workplace.

20.     Betti, Macgregor, and other high-level management had also made numerous discriminatory comments about women, LGBTQ individuals, and transgender inmates. By January of 2022, Plaintiff had reaching her breaking point with respect to remaining silent about ongoing and pervasive discrimination.

21.     On January 11, 2022 ("the 1/11/22 meeting"), Plaintiff met with Justin MacGregor (Human Relations Deputy Director) and Matt Carmody, Esq. (Defendant's labor counsel). Plaintiff determined that she would adamantly escalate her discrimination concerns until remedial action was undertaken institutionally.

22.     During 1/11/22 meeting, Plaintiff expressly complained to MacGregor and Carmody that MacGregor, Betti, and others made continual inappropriate gender and sexual orientation-related comments. Plaintiff specifically complained of gender discrimination and sexual orientation discrimination, explaining she was now at a point where she felt the need to obtain legal counsel.

23.     Plaintiff's discrimination concerns (as expressed in the 1/11/22 meeting) were memorialized later in January of 2022 to the Board of Commissioners, Chief of Staff Brian Jeffers, and Deputy Chief of Staff Tracie Harte.

24.     By late January of 2022, Plaintiff had also discussed her concerns of discrimination complaints with Debi Domenick ("Domenick"), the Commissioner of Defendant. In such dialogue, Domenick assured Plaintiff that Plaintiff's concerns were being addressed with Betti.

25.     By February 14, 2022, Plaintiff's personal legal counsel (she retained) wrote to Defendant on Plaintiff's behalf that Plaintiff: (a) was being "subjected to discrimination;" and (b) there was a hostile work environment with ongoing "gender and sexual orientation" discrimination.

26.    From mid-January of 2022 through mid-February of 2022, Plaintiff had created substantial upheaval within Defendant by raising ongoing concerns of discrimination by the highest levels of management. Upon information and belief, evidence and information possessed by Plaintiff of same culminated in MacGregor's abrupt separation from employment.

27.    The aforesaid examples of discrimination concerns by Plaintiff are just that, examples. Plaintiff expressed numerous concerns of gender and sexual orientation discrimination between January – February of 2022 (verbally and in writing). These are "protected activities" under state law (the Pennsylvania Human Relations Act) and federal law (Title VII of the Civil Rights Act of 1964) prohibiting any form of retaliation (inclusive of termination).

28.    It became overwhelming clear to all levels of Defendant that Plaintiff was demanding institutional change with respect to treatment of women and based upon sexual orientation, with Plaintiff even showing discriminatory text messages to Defendant.

29.    As explained more *infra*, by early March of 2022, Defendant created an (absurd) plan to remove Plaintiff from work permanently (and pretextually). As of early March of 2022, Plaintiff was going to be removed from work by Defendant and (later) terminated (for a fabricated rationale). These actions create an inference of retaliation by being in such close temporal proximity to Plaintiff's ongoing complaints of discrimination in the prior 1-2 months.

30.    The pretextual basis for Plaintiff's termination was a completely innocuous incident that occurred on or about March 2, 2022. By letter dated March 11, 2022 (the "3/11/22 letter"), Plaintiff was informed she was being subjected to a due process hearing for alleged policy violations relating to the March 2, 2022 incident.

31.    But to be clear, there was no "incident." On or about March 2, 2022, Defendant received a small package delivered *and addressed to Plaintiff*. The package was from Odaliz

6

Wong, the wife of an inmate named Steven Wong. The package contained a religious necklace with a crucifix and a wedding band.

32.     Many members of Defendant's administration at times receive mail or packages directed to their attention, and Plaintiff had no idea such a common thing would be utilized as a pretextual springboard to claim she engaged in misconduct (resulting in her termination).

33.     The 3/11/22 letter accused Plaintiff of "displaying favoritism" merely by receiving a package to her on behalf of an inmate. However, packages or letters are often addressed to individuals in management or administration. This was nothing unusual, and illustrative of no wrongdoing. When a letter or package is addressed to Plaintiff, she merely provides it to another official for LCP for review and handling (just as she would have done herein). There is no evidence that Plaintiff cared if a necklace or ring was given to any particular inmate, or that she had any type of preference for this inmate.[2]

34.     The 3/11/22 letter accused Plaintiff of potentially assisting with bringing "contraband" into the LCP. Not only didn't Plaintiff coordinate anything, religious necklaces are permitted to be worn by inmates, as are wedding bands. The only 2 items received in the package were permitted, non-contraband, and regularly worn by many inmates daily. The use of the word contraband in the 3/11/22 letter was a complete exaggeration to give the false impression of wrongdoing when such items are continually delivered and worn by inmates at LCP.

35.     The 3/11/22 letter accused Plaintiff of not cooperating with an investigation. During the first week of March, 2022, Plaintiff was questioned about the package by Betti. Because Betti was the primary person whom Plaintiff made numerous discrimination complaints about (and had

---

[2] If merely having a package or letter directed to the attention of management of LCP were somehow illustrative of favoritism, many officials would have been fired during Plaintiff's tenure. Yet, she was the only person accused of wrongdoing, the only person investigated, and the only person wherein this was used as a hyped-up, nonsensical platform for termination.

just threatened to sue), she merely asked if she could be interviewed by other management or counsel (and could possibly have her own representation). Plaintiff was led to believe this would be fine; or if she knew she could be accused of non-cooperation, Plaintiff would have endured any questions from the person she was threatening to sue.

36.     Shortly after her initial discussion about the March 2, 2022 incident wherein she understood the meeting for questioning would be rescheduled with other management and/or representation, Plaintiff was so distressed by the continuing hostility that she had panic attacks, anxiety, and was suffering from depression. As a result, Plaintiff commenced leave under the Family and Medical Leave Act ("FMLA") on or about March 7, 2022.

37.     Plaintiff's FMLA leave commencing on or about March 7, 2022 delayed the ongoing investigation and intended due process hearing. But Plaintiff was nonetheless informed at the onset of her FMLA leave that she was simultaneously placed on "administrative leave" pending investigation, pending potential termination.

38.     By May of 2022, Plaintiff had filed a Charge with the Equal Employment Opportunity Commission ("EEOC") for discrimination and retaliation, which had not been resolved or remedied (as it was clear she was facing a potential retaliatory termination upon return from FMLA leave).

39.     On or about June 14, 2022, Plaintiff participated in a due process hearing following her aforesaid FMLA leave. She was then terminated officially on or about June 15, 2022 (by and through the recommendation of Betti). Plaintiff had not worked for Defendant since early March of 2022, at which time Defendant planned to terminate Plaintiff (but had to wait until June, 2022, due to Plaintiff's FMLA leave and anticipated return to work).

40.     Plaintiff's harms and damages are extraordinary. She grew up, worked in, and loved the Lackawanna County area. She was a dedicated public servant who worked very hard. But

8

following her termination from employment, there was massive news and online publicity casting her as some virtual criminal who showed favoritism to inmates, tried to obtain contraband, and who abused her political ties within the municipality. Plaintiff has suffered irreparable harm to her career, reputation, and image.

41.     In reality, Defendant terminated a public servant (Plaintiff) who tried to (for nearly 2 months) correct institutional bias and discrimination for a completely absurd, made-up, and nonsensical reason. The pretextual rationale was so absurd, Defendant had to compound the excuse with feigned claims that Plaintiff wasn't cooperative.

42.     Defendant never attempted to mitigate the public harm to Plaintiff with the truth of what had occurred from January – February of 2022. Instead, Defendant perpetuated negative publicity about and concerning Plaintiff to justify its retaliation and to discourage Plaintiff from seeking further legal redress.

43.     As a result of Plaintiff's transparently retaliatory termination, Plaintiff seeks backpay, front pay, emotional distress damages, and other compensation for the tremendous and incurable harm to her reputation and career.

## COUNT I
## Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")
### (Retaliation)

44.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

45.     Plaintiff was terminated because she engaged in protected activities by complaining of individual and institutional discrimination based upon gender and sexual orientation.

46.     Defendant's completely concocted termination of Plaintiff was retaliatory, unlawful, and in violation of Title VII.

**COUNT II**
**Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")**
**(Discrimination & Hostile Work Environment)**

47.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

48.     Plaintiff was subjected to a hostile work environment by:

- Continual discriminatory comments from high-level management and/or human resources personnel about her, women, and inmates;

- Continual scrutiny, different standards being applied to her, and having to undergo several selective investigations that men and/or heterosexual people were not confronted with or subjected to during their tenures;

- Continual disparities in how she was communicated to, demeaned, talked down to, and disrespected; and

- The hostile work environment became extremely heightened in the January – February 2022 timeframe following Plaintiff's state- and federally-protected discrimination complaints.

49.     Plaintiff experienced both a discriminatory and a retaliatory hostile work environment. And such an environment was already known to exist as perpetuated by the highest levels of management within the LCP even before Plaintiff began a campaign of seeking change and remedies to such discrimination.

50.     In addition to the aforesaid hostile work environment, Plaintiff was terminated because of her gender and/or sexual orientation, as: (a) she experienced prior discrimination from Betti; (b) Betti recommended her termination; (c) she was repeatedly selectively investigated; and (d) she was terminated for a reason not enforced against others.

51.     The actions as outlined herein constitute violations of Title VII.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.     Defendant is to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

10

B.      Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C.      Plaintiff is to be awarded liquidated and/or punitive damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D.      Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation);

E.      Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law.

F.      Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.


                                        Respectfully submitted,

                                        **KARPF, KARPF & CERUTTI, P.C.**


                              By:      _____
                                        Ari R. Karpf, Esq.
                                        3331 Street Rd.
                                        Two Greenwood Square, Suite 128
                                        Bensalem, PA 19020
                                        (215) 639-0801

Dated:  December 1, 2022